**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**TRIOSIM CORPORATION**                                                           **PLAINTIFF**

**v.**                                        **No. 4:20-cv-00395-LPR**

**A DALE DRAKE**                                                                  **DEFENDANT**

<u>**ORDER**</u>

Plaintiff Triosim Corporation bought Defendant A. Dale Drake's company, including certain trade secrets. Triosim paid Mr. Drake (and a few others) a large sum of money for the company and gave Mr. Drake a well-paying job. Mr. Drake agreed not to disclose the trade secrets that Triosim purchased for as long as they remained trade secrets. Mr. Drake also agreed not to compete with or assist competitors of Triosim for a period of five years. Triosim believes Mr. Drake has violated and continues to violate both of those covenants, costing Triosim millions of dollars and putting the corporation's existence at risk.

On April 13, 2020, Triosim filed a Verified Complaint in this action.[1] On May 6, 2020, Triosim filed the instant Motion for Temporary Restraining Order and Preliminary Injunction. In the Motion, Triosim asks the Court to:

(1) temporarily restrain Mr. Drake from any violation of the Non-Compete Agreement or any other Transaction Document, from having any contact whatsoever with any employee, agent, officer, director, investor in, attorney for, customer or prospective customer or other party associated with West Coast, a competitor of Triosim; and

(2) preliminarily enjoin Mr. Drake from any act which would be inconsistent with the continued performance of the Non-Compete Agreement or any other Transaction

---

[1] Pl.'s Compl. (Doc. 1). James Hickman, the President of Plaintiff Triosim Corporation, verified the factual allegations of the Complaint, *id.* at 14, and also ratified and confirmed those factual assertions in a Declaration. Attach. (Suppl. Decl. of James Hickman) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 5-1) at 1. Therefore, the Court treats the facts in the Verified Complaint as testimonial evidence.

Document, notwithstanding any time limits set by such Non-Compete Agreement or other Transaction Document, pending the trial of this civil action or other order of this Court.[2]

For the reasons explained below, the Motion is GRANTED in part and DENIED in part.

## FACTUAL FINDINGS

Some facts in this case are undisputed. Most are disputed vigorously. Where there are disputes, the Court has resolved them on a more likely than not standard. But we are very early in the life of this case. Accordingly, the Court wishes to emphasize that its findings at this stage are preliminary. The Eighth Circuit wisely acknowledges the "general rule that 'the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.'"[3] With that important caveat, the Court's findings of fact are set forth below.

### Southern, Its Unique Drum Refurbishment Process and Method, and Its Initial Relationship with West Coast Pre-Fab Limited

1. Defendant A. Dale Drake, along with his brother and nephew, started Southern Specialty Services, Inc. ("Southern") in Star City, Arkansas on April 23, 1990.[4] They will collectively be referred to as "the Owners."

2. Southern was a maintenance service company for papermills.[5] It first serviced papermills in Arkansas, then expanded throughout North America.[6] "The Owners were . . . the key employees of Southern."[7]

---

[2] Pl.'s Mot. for TRO and Prelim. Inj. (Doc. 5) at 4.

[3] *Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958, 962 (8th Cir. 1995), quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

[4] Ex. A (Aff. of A. Dale Drake) to Def.'s Resp. to Mot. for TRO and Prelim. Inj. (Doc. 17-1) at 1.

[5] *Id.*

[6] *Id.*

[7] Pl.'s Compl. (Doc. 1) at 2.

3.   "There are 211 pulp and integrated papermills using the Kraft papermaking process in North America, all of which were built many years ago."[8]   Over ten percent of these mills (twenty-eight in total) are located in British Columbia.[9]   These 211 mills constitute the market for the services at issue in this case.

4.   Papermills shut down for 12-24 hours once a month in order to "correct[] problems and service[] routine preventative maintenance needs."[10]   Papermills also shut down for one to two weeks once a year to "correct issues that will prevent the equipment from reliably running another year."[11]   During these outages, maintenance providers like Southern analyze a papermill for needed services and perform maintenance.[12]

5.   Prior to 2016, only Southern and its key employees had the "ability, knowhow and capital" to refurbish/rebuild (instead of entirely replacing) washer drums for the paper industry.[13]   It appears to be undisputed that this refurbishment process and method extends the life of a drum, which is otherwise very expensive to replace.

6.   In addition to running Southern, the Owners "also started a companion company, Southern Wire, that manufactured and sold wire mesh cloth needed for washer drums used in papermill operations to papermills to be used as part of a maintenance regimen."[14]

7.   Beginning in approximately 2012, Southern Wire began a relationship with West Coast Pre Fab, Ltd. ("West Coast"), a Canadian company based in British Colombia.[15]   West Coast

---

[8] Attach. (Second Suppl. Decl. of James Hickman) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18-1) at 1.

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*; Attach. (Supp. Aff. of A. Dale Drake) to Def.'s Sur-Reply to Mot. for TRO and Prelim. Inj. (Doc. 20-1) at 2.

[13] Attach. (Suppl. Decl. of James Hickman) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 5-1) at 1.

[14] Ex. A (Aff. of A. Dale Drake) to Def.'s Resp. to Mot. for TRO and Prelim. Inj. (Doc. 17-1) at 1.

[15] *Id.* at 2.

specialized in the construction and erection of metal buildings and related structural steel work.[16]

West Coast is located in an ideal area for a papermill servicing business, as there are twenty-eight

paper mills in British Columbia.[17]

8. In 2013, West Coast hired Barry Kennewell as a sales representative to develop

business in the papermill industry, but despite this effort, the company had "very little papermill

business until 2015."[18]  Southern Wire would pay West Coast commissions for wire sales,[19] and

on at least one occasion, Southern Wire hired West Coast to provide labor for a wire install.[20]

<u>Triosim Buys Southern and Its Unique Drum Refurbishment Process and Method</u>

9. In the spring of 2015, Triosim and Southern began negotiations for the purchase of

Southern and Southern Wire by Triosim.[21]  This culminated in the execution of an Asset Purchase

Agreement on or about June 11, 2015.[22]  Closing was on June 30, 2015.[23]

10. As part of the closing of the sale, Southern, Triosim, and the Owners executed

numerous documents and contracts among themselves (collectively referred to as the "Transaction

---

[16] Attach. (Second Suppl. Decl. of James Hickman) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18-1) at 3.

[17] *Id.* at 1.

[18] Attach. (Aff. of Barry Kennewell) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18-2) at 1; *see also* Attach. (Second Suppl. Decl. of James Hickman) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18-1) at 2 ("West Coast Pre Fab, Ltd. engaged principally in the business of erecting metal buildings but hired a salesman, Barry Kennewell, to sell to papermills in 2013.").

[19] Ex. A (Aff. of A. Dale Drake) to Def.'s Resp. to Mot. for TRO and Prelim. Inj. (Doc. 17-1) at 2.

[20] Attach. (Second Suppl. Decl. of James Hickman) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18-1) at 2 (stating that "[o]n one occasion, in March, 2015, West Coast provided labor to [Southern] to install wire mesh on a drum, for which [Southern] paid West Coast $22,996.05 at Defendant's request"); *see also* Ex. B (Aff. of Ian Clarke) to Def.'s Resp. to Mot. for TRO and Prelim. Inj. (Doc. 17-2) at 1 ("Southern Wire would hire West Coast to preform wire installs."); Ex. A (Aff. of A. Dale Drake) to Def.'s Resp. to Mot. for TRO and Prelim. Inj. (Doc. 17-1) at 2 ("I would also hire West Coast employees, on a temporary basis, in order to assist Southern in performing maintenance work in British Columbia paper mills.").

[21] Pl.'s Compl. (Doc. 1) at 2.  Although it had a different name back then (JLM), the Court will refer to Plaintiff as "Triosim" regardless of the time period in question.

[22] *Id.*

[23] Ex. A (Aff. of A. Dale Drake) to Def.'s Resp. to Mot. for TRO and Prelim. Inj. (Doc. 17-1) at 1.

Documents").[24] These included the aforementioned (and previously executed) Asset Purchase Agreement, a Bill of Sale & Assignment of Personal Goodwill, an Employment Agreement between Triosim and Mr. Drake, and a Non-Competition and Confidentiality Agreement between Triosim and each of the Owners.[25]

11. Southern became essentially a division of Triosim; Triosim kept the name Southern for that part of the business because the name was known in the industry.

12. The Transaction Documents made note that the Owners, including Dale Drake, were not just passive owners.   The Asset Purchase Agreement stated that the Owners "[w]ere instrumental in the growth and success of the Business . . . ."[26]  The Bill of Sale & Assignment of Personal Goodwill stated that the Owners had "built and maintained significant business relationships with other companies involved in the Business and personally attracted customers in such industry for the Corporation,"[27] and that "a large part of the success of the Corporation's business is due to the personal efforts and goodwill of Jerry Drake, Dale Drake and Tim Drake."[28] The Non-Compete Agreement stated that "Owners are the managers of Seller and have been instrumental in establishing, growing and carrying on Seller's business and in developing the processes, procedures, production methods, technical information and other know-how and ways of doing things used in Seller's business."[29]

---

[24] Pl.'s Compl. (Doc. 1) at 2.

[25] *Id.*

[26] *Id.* at 15.  The Complaint and the Transaction Documents are all included in Doc. 1.

[27] *Id.* at 54.

[28] *Id.* at 54.

[29] *Id.* at 62.

13. Triosim paid the Owners, collectively, $7,050,000 for the Purchased Assets.[30]  Triosim paid Mr. Drake $900,000 for his "Personal Goodwill."[31]  Triosim and Mr. Drake entered into the Employment Agreement by which Triosim agreed to employ Mr. Drake as an executive for a salary of $180,000 per year, together with fringe benefits, for two years and thereafter at will.[32]

14. The Non-Compete Agreement is at the heart of this dispute, so the Court highlights in detail some crucial language in the Agreement.  The Non-Compete Agreement noted that the "Owners have occupied a position of trust and confidence with Seller prior to the date hereof and have been instrumental in developing, have had access to and have become familiar with the confidential information of Seller . . . ."  Thus the Agreement was "necessary to protect and preserve Buyer's legitimate business interests . . . ."[33]

15. Paragraph 2 of the Non-Compete Agreement describes the trade secrets Triosim purchased and also the care Mr. Drake agreed to take to protect those trade secrets.[34]  Among other things, Mr. Drake agreed that:

> Neither Seller nor any Owner shall, directly or indirectly, either individually or as an agent, employee, partner, member, shareholder or Seller, or in any other capacity, use or disclose, or cause or allow to be used or disclosed, any Trade Secrets . . . at any time . . . .  This restriction shall apply so long as the Trade Secret remains a Trade Secret of the Buyer . . . .[35]

"Trade Secrets" are defined in Paragraph 2 as follows:

> Trade Secrets shall mean information (including a formula, pattern, compilation, program, device, method, technique or process) which:

---

[30] *Id.* at 19.

[31] *Id.*

[32] *Id.* at 3.

[33] *Id.* at 62.

[34] *Id.* at 4.

[35] *Id.* at 62-63.

2.1. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

2.2. Is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.[36]

16. The contracted duration of the Trade Secrets protection provision lasts "so long as the Trade Secret remains a Trade Secret."[37]

17. The indefinite duration of the Trade Secrets provision is juxtaposed with the non-competition portions of the Non-Compete Agreement, which are limited to a period of five years.[38]

18. In Paragraph 3 of the Non-Compete Agreement, Mr. Drake agreed not to, among other things, "[r]ender any assistance to a competitor of Buyer in soliciting any . . . Customer or Prospect for providing any trade, business, product and/or service which is competitive with the business of the Buyer" for a period of five years.[39]

19. In Paragraph 4 of the Non-Compete Agreement, Mr. Drake agreed to "not directly or indirectly cause, or seek to cause, any customer or supplier of the Seller or Buyer to terminate or otherwise discontinue, or to reduce the volume of, the customer's or supplier's business with the Buyer or render any assistance to a competitor of the Buyer for such purpose" for a period of five years.[40]

20. In Paragraph 5 of the Non-Compete Agreement, Mr. Drake agreed that, for a period of five years, he would not:

> directly or indirectly, engage or invest in, own, manage, operate, finance, control or participate in the ownership, management, operation, financing or control of, be employed by, associated with or in any manner connected with, or render services

---

[36] *Id.* at 63.

[37] *Id.*

[38] *Id.* at 63-65.

[39] *Id.* at 63.

[40] *Id.* at 64.

or advice or other aid to, or guarantee any obligation of, any person who or which is engaged in or is planning to become engaged in, anywhere in the United States or Canada, any business whose products or services compete, in whole or in part, directly or indirectly, with Buyer's products or services at any time.[41]

21. In Paragraph 6 of the Non-Compete Agreement, Mr. Drake agreed to guard and protect Triosim's "Confidential Information" for a period of five years.  The Confidential Information included business-related information such as customer lists, names of vendors, employee records, and business plans.[42]

22. In Paragraph 9, Mr. Drake agreed that "in the event of a breach or threatened breach" of the Non-Compete Agreement (including the Trade Secrets provisions), "money damages would not be an adequate remedy . . . and even if money damages were adequate, it would be difficult to ascertain or measure with any degree of accuracy . . . ."  Mr. Drake further agreed that Triosim "shall be entitled to an injunction restraining" a breach or threatened breach.[43]

23. The Court finds that the process and method purchased by Triosim to refurbish/rebuild worn out drums is a Trade Secret under Paragraph 2 of the Non-Compete Agreement.[44]  The process and method "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use,"[45] as shown by the consideration Triosim gave in exchange for, among other assets, Southern's trade secrets.  The process and method is

---

[41] *Id.*

[42] *Id.* at 65.

[43] *Id.* at 66.

[44] *Id.* at 63 ("Trade Secrets shall mean information (including a formula, pattern, compilation, program, device, method, technique or process) which . . . Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and . . . Is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.").

[45] *Id.*

also "the subject of efforts to maintain its secrecy that are reasonable under the circumstances,"[46] as shown by the Non-Compete Clause that Triosim required the Owners to sign and its efforts to enforce that Agreement.  The process and method provide a unique competitive advantage to whoever has it, because they can offer a cheaper and more efficient way to fix washer drums that would otherwise be at the end of their life cycle.

24. The Court finds that the process and method purchased by Triosim to refurbish/rebuild worn out drums is a Trade Secret under the Arkansas Trade Secrets Act,[47] and *Saforo & Assocs., Inc. v. Porocel Corp*.[48]  Specifically, the Court finds that:

(1) the process and method was not known outside Triosim's business;[49]

(2) the process and method was not widely or generally known by Triosim's employees or others in the business, as evidenced by the fact that Mr. Drake was a "key employee" retained by Triosim after the sale due to his intimate understanding of the process and method;[50]

(3) Triosim took measures to guard the secrecy of the process and method, as evidenced by Paragraph 2 of the Non-Compete Agreement that Triosim asked the Owners to agree to as part of the sale of their business;[51]

---

[46] *Id.*

[47] Ark. Code Ann. § 4-75-601(4)(A) ("Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.").  This definition of "Trade Secrets" is almost identical to the definition in the Non-Compete Agreement.

[48] 337 Ark. 553, 559-62, 991 S.W.2d 117, 120-22 (1999) (applying Ark. Code Ann. § 4-75-601(4) and holding that courts should apply the following six factors in determining whether information qualifies as a trade secret: (1) "the extent to which the information is known outside the business," (2) "the extent to which the information is known by employees and others involved in the business," (3) "the extent of measures taken by [a plaintiff] to guard the secrecy of the information," (4) "the value of the information to [a plaintiff] and to its competitors," (5) "the amount of effort or money expended by [a plaintiff] in developing the information," and (6) "the ease or difficulty with which the information could be properly acquired or duplicated by others").

[49] Attach. (Suppl. Decl. of James Hickman) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 5-1) at 1 (stating that prior to Mr. Drake's investment in West Coast, only Triosim and its key employees had the "ability, knowhow and capital" to refurbish washer drums for the paper industry).

[50] *Id.* (stating that prior to Mr. Drake's investment in West Coast, only "Plaintiff and its key employees," which at that point included Mr. Drake, "had the ability [and] knowhow" to refurbish washer drums).

[51] Pl.'s Compl. (Doc. 1) at 62-63.

(4) the process and method was valuable to Triosim and its competitors, as evidenced by the consideration Triosim paid to the Owners for the process and method;[52]

(5) it takes a considerable amount of effort and money to develop the process and method, as evidenced by the fact that Triosim chose to buy Southern for a substantial amount rather than attempt to develop its own process and method, and by the $1,000,000 loan Mr. Drake provided to West Coast before it began implementing the process and method;[53] and

(6) it would be difficult for others to acquire or duplicate the process and method without the guidance of Mr. Drake or Triosim's key employees.[54]

<u>West Coast's Journey from Triosim's Sales Representative to Triosim's Competition</u>

25. As outlined above, after the sale of Southern's assets to Triosim, Mr. Drake went to work for Triosim.  Mr. Drake "continued as an employee of Southern" and "continued to be in contact with West Coast as an employee of [Triosim/Southern]."  Mr. Drake says he "would occasionally advise West Coast, answer questions, etc. in [his] capacity as an employee of the company that [Triosim] now owned."[55]

26. On September 9, 2015, a few months after the sale of Southern to Triosim, Mr. Drake emailed the new President of Triosim's Southern (Kurt Bramer) with a suggestion.  Mr. Drake suggested that the company should engage West Coast as a sales representative in Canada. Southern's former Canadian sales representative (Tim Steinke) had recently passed away.[56]

27. The email stated as follows:

Kurt,

If we are all completed with the changes, I would like to get back West Coast.

---

[52] *See* Pl.'s Compl. (Doc. 1) at 19.

[53] Attach. (Aff. of Barry Kennewell) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18) at 2.

[54] Attach. (Second Suppl. Decl. of James Hickman) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18-1) at 2 ("It is not conceivable that a group of mechanics with 2-3 years of experience will be able to effectively handle the complex repair requirements.").

[55] Ex. A (Aff. of A. Dale Drake) to Def.'s Resp. to Mot. for TRO and Prelim. Inj. (Doc. 17-1) at 2.

[56] Attach. (Second Suppl. Decl. of James Hickman) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18-1) at 2.

I don't like leaving our good accounts in the B C territory with no one calling on them.

A J is very aware that nobody has replaced Tim Steinke as Southern salesmen in Canada.[57]

28. On September 30, 2015, Triosim's Southern entered into a Sales Agreement with West Coast, in which it agreed to pay West Coast a commission on "Rebuild Sales" and "Wire sales."[58] The Sales Agreement stated that West Coast "will conduct business on the behalf of and represent [Southern] as a sales representative."

29. Despite the Sales Agreement referring to West Coast as a sales representative, Mr. Drake says that "during this time West Coast . . . was essentially Southern's mechanical service department and sales force in the western Canada market" and that "Southern . . . and West Coast worked together to identify and take advantage of business opportunities in the paper mill industry in western Canada."[59]

30. To bolster his point, Mr. Drake provides a February 2016 letter sent by the President of Triosim's Southern to one of its customers—a letter Mr. Drake suggests is one of many similar letters.[60]  The letter says Triosim's Southern wanted to "intro West Coast . . . as [Southern's] Western Canada Representative" and that "[i]n this capacity, [West Coast] will offer sales and service on all products that [Southern] offer[s] into the marketplace, including Washer Drum Rebuilds, Backing wires, Stainless Steel and K-Steel Face Wires, High quality banding and related

---

[57] *Id.*

[58] Ex. C (Sales Agreement) to Def.'s Resp. to Mot. for TRO and Prelim. Inj. (Doc. 17-3) at 1.

[59] Ex. A (Aff. of A. Dale Drake) to Def.'s Resp. to Mot. for TRO and Prelim. Inj. (Doc. 17-1) at 3.

[60] *Id.*

tooling."  The letter goes on to say that West Coast "will have the support of [Southern] in helping to solve problems, or discuss wire solutions with you."[61]

31.  Triosim President James Hickman says that during the life of the Sales Agreement between Triosim and West Coast, "West Coast undertook only limited services to [Triosim], for which it received commissions."  He also says that, at that time of the signing of the Sales Agreement, "West Coast had a very small facility for the construction and erection of metal buildings and related structural steel work," and "had no resources to acquire the knowledge to refurbish drums and no capital to build refurbishing facilities  . . . ."[62]

32. West Coast's General Manager Ian Clarke describes West Coast at this time as "essentially Southern's de facto sales force in the Western Canada market."[63]  He also says that "representatives of West Coast (including [him]), and Southern discussed embarking on a joint venture doing washer rebuilds and selling parts together in British Columbia."[64]  He does not say who at Southern he had this conversation with, nor does he say that anything ever came of the discussion.

33. After Triosim and West Coast entered into the Sales Agreement, West Coast assigned Mr. Kennewell to the Triosim account.  Mr. Kennewell, who eventually left West Coast and is now an employee of Triosim, stated that "[u]ntil late 2015 West Coast worked solely as a sales representative for Plaintiff."[65]

---

[61] Ex. D (Letter from Southern introducing West Coast) to Def.'s Resp. to Mot. for TRO and Prelim. Inj. (Doc. 17-4) at 1.

[62] Attach. (Second Suppl. Decl. of James Hickman) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18-1) at 3.

[63] Ex. B (Aff. of Ian Clarke) to Def.'s Resp. to Mot. for TRO and Prelim. Inj. (Doc. 17-2) at 2.

[64] *Id.* at 3.

[65] Attach. (Aff. of Barry Kennewell) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18-2) at 2.

34. Mr. Kennewell met Mr. Drake after being assigned to the Triosim account.   Mr. Kennewell states that "West Coast directed me to personally shadow Mr. Drake and to visit papermills in Canada and the United States for training with him to learn about washer drums from him."[66]

35. In March 2016, Mr. Drake loaned $1,000,000 to West Coast.[67]  Neither Mr. Drake nor West Coast disclosed this loan to Triosim.[68]  Mr. Drake says that the loan was made in his "individual capacity,"[69] not on behalf of Triosim.

36. As part of the lead up to this loan, West Coast had sent a letter to Mr. Drake on February 16, 2016.  The letter thanked Mr. Drake for his "time on the telephone yesterday, and [his] faith and support in our company."  The letter stated that "[w]e truly believe this will be a long and fruitful business relationship, and we are excited at working together with you and getting exposed to your years of experience and knowledge."  The letter offered "two options, a loan or investment option, or a ownership or buy in option."  The letter noted that West Coast believed the loan option "would be simpler for" both parties "to administer and manage."  The letter closed by saying West Coast "looked forward to working with" Mr. Drake.[70]

37. Mr. Drake and West Coast's General Manager Ian Clarke assert that the loan was meant to help West Coast with "cash flow" problems.[71]  No one explains what the alleged cash flow problems were.

---

[66] *Id.*

[67] Pl.'s Compl. (Doc. 1) at 69.

[68] *See id.* at 6 ("Plaintiff discovered the existence of the West Coast Note when Triosim's President received a copy of the Promissory Note in November, 2019").

[69] Ex. A (Aff. of A. Dale Drake) to Def.'s Resp. to Mot. for TRO and Prelim. Inj. (Doc. 17-1) at 3.

[70] Ex. A (Letter from West Coast to A. Dale Drake) to Attach. (Second Suppl. Decl. of James Hickman) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18-1) at 5.

[71] Ex. A (Aff. of A. Dale Drake) to Def.'s Resp. to Mot. for TRO and Prelim. Inj. (Doc. 17-1) at 3; Ex. B (Aff. of Ian Clarke) to Def.'s Resp. to Mot. for TRO and Prelim. Inj. (Doc. 17-2) at 3.

38. Mr. Kennewell, who, as noted above, used to work for West Coast and now works for Triosim, states that he was "present during conversations between Mr. Drake and [West Coast's General Manager] Ian Clarke during which they discussed the use of the proceeds of Mr. Drake's $1,000,000 loan to West Coast" and "that [the] purpose was to allow West Coast to complete a washer drum rebuild facility."[72]   Mr. Kennewell also states that he "heard Mr. Drake" say that West Coast borrowed the million dollars "to build its own drum rebuilding facility."[73]

39. After receiving the loan, West Coast built a washer drum refurbishment/rebuilding facility.[74]   Triosim's President Mr. Hickman states that "immediately upon [Mr. Drake's] investment . . . , West Coast began the business of refurbishing washer drums for the paper industry, a business which West Coast had never before performed and which until then only [Triosim's Southern] and its key employees had the ability, knowhow, and capital to conduct."[75]

40. Mr. Kennewell states that he saw Mr. Drake "at the facility several times acting as a resource for technical information regarding washer drum maintenance and refurbishment."[76]  Mr. Kennewell states that Mr. Drake "provided West Coast all the technical information and financial resources it needed to independently engage in the business of maintaining and refurbishing washer drums for the paper mill industry."  Mr. Kennewell states that he "was directed to ask Mr. Drake any technical questions regarding the drums."[77]

---

[72] Attach. (Aff. of Barry Kennewell) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18-2) at 2.

[73] *Id.*

[74] *Id.*

[75] Attach. (Suppl. Decl. of James Hickman) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 5-1) at 1.

[76] Attach. (Aff. of Barry Kennewell) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18-2) at 2.

[77] *Id.*

41. Mr. Kennewell also states that that Mr. Drake "assisted in developing the washer drum business" for West Coast.[78]  Mr. Kennewell provides West Coast's meeting minutes from September 2016 where West Coast management asked themselves if they should "[b]ring in Dale" to help on West Coast's "Drum Inspection & Testing" quote for Domtar,[79] which was then a client of Triosim.[80]

42. Mr. Kennewell also explains that West Coast "sold three washer drum jobs to former customers of Triosim," and that "[t]he drums were delivered to West Coast's new rebuild facility . . . ."[81] Mr. Kennewell states that "West Coast directed me to advise customers we would be inspecting and rebuilding drums at our facility under the technical direction and supervision of [Southern]."[82]  Mr. Kennewell provides a drum rebuild quote letter that West Coast sent to a customer that has "Proud Partner of Southern Specialty Services / Southern Wire" in the letterhead. The same quote notes that payments become due "after receipt of drum at West Coast Pre Fab Rebuild Facility."[83]

43. Mr. Kennewell asked West Coast's managers if Triosim "knew of this arrangement, and whether [he] should contact [the President of Triosim's Southern] Kurt Bramer."  The West Coast managers told him "to say nothing, as only [Mr. Drake] knows."[84]  Mr. Kennewell states

---

[78] *Id.*

[79] *Id.* at 5.

[80] *See* Ex. A (Aff. of A. Dale Drake) to Def.'s Resp. to Mot. for TRO and Prelim. Inj. (Doc. 17-1) at 3.

[81] Attach. (Aff. of Barry Kennewell) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18-2) at 3.

[82] *Id.*

[83] *Id.* at 9.

[84] *Id.* at 3.

that "[w]hen [he] questioned them of the ethics and risk to [Mr. Drake's] reputation [he] was told to not contact Mr. Bramer or Mr. Drake and to let Marc[85] handle everything."[86]

44. Mr. Kennewell states that because he "did not approve of West Coast's behavior with regard to Plaintiff, [he] accepted a position with Plaintiff in late 2017."[87]

45. On January 22, 2018, Triosim terminated its contract with West Coast.[88]

46. Mr. Kennewell states that he did not disclose information to Triosim about Mr. Drake "by name" until late 2019. The Court wonders why not, but that fact alone is not enough in the Court's eyes to undermine Mr. Kennewell's credibility. In any event, Triosim may have grown suspicious about Mr. Drake even before Mr. Kennewell revealed Mr. Drake's involvement with West Coast "by name." Triosim states that:

> [l]ate in 2018, Triosim's President learned from a Canadian customer that West Coast had a new investor and agent who had brought West Coast the intellectual property to construct and maintain a washer rebuild facility which would create a dangerous competitor to [Triosim] in Canada. When Triosim's President returned to the United States, he asked [Mr. Drake] if he knew anything about new competition in Canada and specifically who the expert might be who was teaching West Coast how to use [Triosim's] intellectual property. [Mr.] Drake said he knew nothing about any of those issues.[89]

47. In "late 2019," Mr. Kennewell "disclosed information regarding Mr. Drake by name" to Triosim when he "became aware of how many Canadian customers of Triosim were being solicited and occasionally sold by West Coast."[90] This approximate date given by Mr. Kennewell lines up with the November 2019 date given by Triosim as the date when it "discovered the

---

[85] "Marc" appears to be a member of West Coast's management team. *See id.* at 5 (meeting minutes showing that "Marc" was present).

[86] *Id.* at 3.

[87] *Id.*

[88] Ex. A (Aff. of A. Dale Drake) to Def.'s Resp. to Mot. for TRO and Prelim. Inj. (Doc. 17-1) at 2.

[89] Pl.'s Compl. (Doc. 1) at 5-6.

[90] Attach. (Aff. of Barry Kennewell) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18-2) at 3.

existence of the West Coast Note when Triosim's President received a copy of the Promissory Note"[91] related to Mr. Drake's million dollar loan to West Coast.  Triosim states that "[u]pon discovering [Mr. Drake's] double dealing, [Triosim] immediately confronted [Mr. Drake] with his breaches of contract," and ultimately terminated Mr. Drake's employment at the end of December 2019.[92]

48. Triosim's President Mr. Hickman states that Triosim has lost at least $1,462,861, "which is the total amount of business lost by [Triosim] to West Coast for two drums already completed and one in process."[93]  He states that "Triosim will suffer millions more in losses of customers to West Coast due to [Mr. Drake's] actions, including lost maintenance work in both Canada and the United States."[94]  By adopting the facts in the Verified Complaint in his declaration, he also says that "the potential economic loss that has and will continue to result from Mr. Drake's" conduct "is so great as to threaten the existence of Plaintiffs business."[95]

49. Mr. Hickman also says that West Coast will require the continued expertise of someone like Mr. Drake to oversee the refurbishment process.  Specifically, he says "[i]t is not conceivable that a group of mechanics with 2-3 years of experience will be able to effectively handle the complex repair requirements."[96]

50. Mr. Drake denies that he acted in competition with Triosim.  He states that:

- "Prior to the termination of [Triosim's Sales Agreement with West Coast] in January of 2018, I never considered West Coast a competitor of Southern Specialty.

---

[91] Pl.'s Compl. (Doc. 1) at 6.

[92] *Id.* at 7.

[93] Attach. (Second Suppl. Decl. of James Hickman) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18-1) at 3.

[94] *Id.*

[95] Pl.'s Compl. (Doc. 1) at 12.

[96] Attach. (Second Suppl. Decl. of James Hickman) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18-1) at 2.

- "Since termination of the Agreement, I never performed any consulting work for, nor was I ever compensated by, West Coast.

- "At no time after the termination of the Agreement did I ever disclose trade secrets, intellectual property, or confidential information of Southern, JLM, or Triosim to West Coast.

- "At no time after the termination of the Agreement have I entered into any sort of business venture with, or for the benefit of, West Coast.

- "At no time after the termination of the Agreement did I ever solicit customers for West Coast.

- "At no time after the termination of the Agreement did I ever render assistance to West Coast in soliciting customers or prospects.

- "At no time after the termination of the Agreement did I cause customers of Southern, JLM, or Triosim to discontinue, reduce, or terminate their business with these compames.

- "At no time have I ever been or acted as an employee or an owner of West Coast.

- "Any time I provided any sort of assistance or information to West Coast was (i) prior to the termination of the Agreement with West Coast on January 22, 2018, and (ii) in my capacity as an employee of Southern and done in furtherance of the interests of Southern and its parent companies."[97]

West Coast General Manager Ian Clarke gave similar testimony, stating that:

- "At no time prior to the termination of [Triosim's Sales Agreement with West Coast] in January of 2018 was West Coast ever a competitor of Southern Specialty.

- "At no time since the termination of the Agreement referenced above has Dale Drake ever performed consulting work, compensated or otherwise, for West Coast.

- "At no time after the termination of the Agreement has Dale Drake ever disclosed Southern Specialty's trade secrets, intellectual property, or confidential information to West Coast.

- "At no time after the termination of the Agreement has Dale Drake been involved in any sort of business venture with, or for the benefit of, West Coast.

---

[97] Ex. A (Aff. of A. Dale Drake) to Def.'s Resp. to Mot. for TRO and Prelim. Inj. (Doc. 17-1) at 3-4.

- "At no time after the termination of the Agreement has Dale Drake attempted to facilitate West Coast trying to hire employees of JLM or its related entities."[98]

Significantly, Mr. Drake and Mr. Clarke state that West Coast was not a competitor <u>prior</u> to the termination of the Sales Agreement, but do not state whether West Coast has become a competitor since the termination. They also state that Mr. Drake has not consulted, disclosed protected Triosim information, solicited customers, or recruited Triosim employees <u>after</u> the termination of the Sales Agreement, but do not state whether he did so before the termination.

51. In light of all of the foregoing, the Court finds that Mr. Drake disclosed Triosim's trade secrets regarding its washer drum rebuild/refurbishment process and method to West Coast. "West Coast did not engage in the business of refurbishing washer drums for the paper industry"[99] and "had no resources to acquire the knowledge to refurbish drums" apart from Mr. Drake giving it to West Coast.[100]   Further, the Court believes and credits the entirety of Mr. Kennewell's affidavit, including any facts disputed by the Drake or Clarke affidavits.   The washer drum refurbishing/rebuilding process and method seems technical and complex enough that it is likely that West Coast learned the process and method through Mr. Drake's intentional and detailed efforts.   Mr. Drake's undisclosed loan to West Coast for a washer drum facility, his deceitful response to Triosim when asked if he knew who helped West Coast to compete, his part in the scheme to deceive three Triosim customers into giving their business to West Coast, and the other circumstantial evidence discussed above point in this same direction.

52. The Court finds this disclosure was without authorization on the part of the Triosim. Whether or not West Coast was only a sales representative for Triosim or was also involved in

---

[98] Ex. B (Aff. of Ian Clarke) to Def.'s Resp. to Mot. for TRO and Prelim. Inj. (Doc. 17-2) at 3.

[99] Attach. (Suppl. Decl. of James Hickman) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 5-1) at 1.

[100] Attach. (Second Suppl. Decl. of James Hickman) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18-1) at 3.

some maintenance of washer drums and related wires, the evidence does not suggest Triosim was using West Coast, or wanted to use West Coast, to do its washer refurbishments/rebuilds.  Nothing credible suggests that Triosim wanted Mr. Drake to disclose its protected process and method of refurnishing/rebuilding washer drums to West Coast.  Indeed, the bulk of the evidence (and reasonable inferences from that evidence) suggests that Mr. Drake and West Coast were carrying on a secret relationship outside the scope of Mr. Drake's work for Triosim.

53. The Court finds the disclosure discussed in the two preceding paragraphs violates Paragraph 2 (the Trade Secrets provisions) of the Non-Compete Agreement.

54. The Court also finds that, in addition to disclosing Triosim's trade secrets, Mr. Drake "used" Triosim's secret drum refurbishment/rebuild process and method when he provided on-site assistance at West Coast's new rebuild facility.[101]  At the very least, he "caused or allowed" West Coast to "use" the trade secret by giving such assistance.  Either way, this violated Paragraph 2 of the Non-Compete Agreement.  That Paragraph prohibits directly or indirectly using or causing or allowing the use of a trade secret.

55. The Court also finds that it is likely that Mr. Drake's improper assistance is continuing. The Court expressly discredits Mr. Drake's and Mr. Clarke's affidavits to the extent they suggest that Mr. Drake has had nothing to do with West Coast since the Sales Agreement between Triosim and West Coast was terminated.  Their overall veracity is undermined by the secrets they hid from Triosim, and the implausible claim that the million-dollar loan was for something other than the washer drum refurbishment facility.  The investment letter from West Coast to Mr. Drake describing a continuing and burgeoning relationship, the information related by a Canadian customer to Triosim's President in late 2018 about some expert helping West Coast with the drum

---

[101] Attach. (Aff. of Barry Kennewell) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18-2) at 2.

refurbishment/rebuild process and method, and the sheer difficulty of performing the process on a continuous basis all make it more likely than not that Mr. Drake is at least still advising West Coast about or helping West Coast with the process.

56. The Court finds that Mr. Drake's past and continued use of trade secrets, or his causing or allowing West Coast to use the trade secrets, was and is unauthorized by Triosim.  There is no evidence that Triosim even knew West Coast had built a washer refurbishment/rebuild facility, much less that Triosim told Mr. Drake to help in such an endeavor.  The evidence suggests Mr. Drake and West Coast actively hid this endeavor, and Mr. Drake's related assistance, from Triosim.

57. The Court finds that Mr. Drake has helped West Coast obtain washer drum rebuild/refurbishment business from customers of Triosim.  The Court finds it more likely than not that this help continues to this day and will continue into the future.  This help includes "active management and direction," as well as advising on quotes to customers.[102]  Given Mr. Drake's stature in the industry, it is also more likely than not that this relationship included and continues to include steering Triosim customers to West Coast.  The affidavit of Mr. Kennewell—especially in its description of the scheme to push customers from Triosim to West Coast—and the investment letter from West Coast to Mr. Drake suggest there will be continuing help of this nature from Mr. Drake to West Coast.

58. The Court finds that the actions in Paragraph 57 above violate Paragraph 2 of the Non-Compete because they cause or allow West Coast to use the trade secrets that Mr. Drake disclosed to them.  Every time Mr. Drake gets a client (or helps get a client) for West Coast's washer drum

---

[102] *Id.*

refurbishment/rebuild business, he knows or has reason to know that West Coast will be using Triosim trade secrets that he gave to West Coast.

59. The Court finds that Mr. Drake violated Paragraph 3 of the Non-Compete Agreement regarding "Customer Restriction."[103]   West Coast discussed "bring[ing] in Dale"[104] when preparing a quote to obtain business from what had until then been a Triosim customer.   "Only Dale" knew that West Coast was holding itself out as a Triosim refurbishment partner[105] in order to mislead Triosim customers to move business to West Coast.  This evidence shows that Mr. Drake "[r]ender[ed] assistance to a competitor" by "soliciting" a "Customer or Prospect for providing [a] trade, business, product and/or service which is competitive with the business" of Triosim.[106]

60. The Court finds that Mr. Drake violated Paragraph 4 of the Non-Compete Agreement regarding "Contractual Relations."[107]  The evidence indicates that Mr. Drake rendered "assistance to a competitor" in "directly or indirectly caus[ing], or seek[ing] to cause," a customer of Triosim "to terminate or otherwise discontinue, or to reduce the volume of the customer's" business with Triosim.[108]

61. The Court finds that Mr. Drake violated Paragraph 5 of the Non-Compete Agreement regarding "Noncompetition and Non-solicitation."[109]   The evidence that "[i]mmediately upon Defendant's investment in West Coast, West Coast began the business of refurbishing washer

---

[103] Pl.'s Compl. (Doc. 1) at 63.

[104] Attach. (Aff. of Barry Kennewell) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18-2) at 5.

[105] *Id.* at 3.

[106] Pl.'s Compl. (Doc. 1) at 63.

[107] *Id.*

[108] *Id.* at 64.

[109] *Id.*

drums for the paper industry"[110] indicates that Mr. Drake "finance[d]" a company that was "planning to become engaged in" a "business whose products or services compete" with Triosim's refurbishment services in violation of the Non-Compete Agreement.[111]  Again, the Court credits Mr. Kennewell's affidavit in this regard and finds the Drake and Clarke affidavits incredible insofar as they claim the loan was not about building a washer drum refurbishment/rebuild facility.

62. In addition to the all of the foreoing, Triosim alleges that, around March 31, 2020, it learned that Mr. Drake "made firm plans to visit Rayonier,"[112] a "very important client" of Triosim,[113] during an upcoming papermill outage at Rayonier.  Triosim states that because Mr. Drake "has some very good contacts at this mill, has clearly remained in touch with them after leaving the company, and has scheduled himself and rescheduled himself for [a visit] during this outage, this visit is plainly a sales and service call."[114]  Mr. Drake states that he has "made no plans to visit Rayonier or any other client of JLM/Triosim Corporation, either now or in the foreseeable future."[115]  Both sides have submitted significant and dueling documentary evidence regarding the existence or non-existence of a reservation for Mr. Drake at a hotel near Rayonier.[116]  At this stage, the Court considers the evidence to be in equipoise, so it cannot conclude that it is more likely than not that Mr. Drake had the hotel reservation in question or is planning a visit to Rayonier.

---

[110] Attach. (Suppl. Decl. of James Hickman) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 5-1) at 1.

[111] Pl.'s Compl. (Doc. 1) at 64.

[112] *Id.* at 8.

[113] Attach. (Second Suppl. Decl. of James Hickman) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18-1) at 3.

[114] *Id.*

[115] Attach. (Supp. Aff. of A. Dale Drake) to Def.'s Sur-Reply to Mot. for TRO and Prelim. Inj. (Doc. 20-1) at 1.

[116] *See* Attach. (Second Suppl. Decl. of James Hickman) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18-1); Attach. (Supp. Aff. of A. Dale Drake) to Def.'s Sur-Reply to Mot. for TRO and Prelim. Inj. (Doc. 20-1); Attach. (Decl. of Warren Flenniken) to Pl.'s Notice of Filing (Doc. 22-1).

DISCUSSION

Preliminary injunctive relief is an extraordinary remedy.[117]  It is not a step this Court takes

lightly.  But, as the Eighth Circuit has recognized, there are cases where it is appropriate and

necessary.[118]  When determining whether to issue preliminary injunctive relief, courts in the Eighth

Circuit apply the four factors set forth in *Dataphase Sys., Inc. v. CL Sys., Inc*: the probability that

movant will succeed on the merits, the threat of irreparable harm to the movant, the state of balance

between this harm and the injury that granting the injunction will inflict on other parties, and the

public interest.[119]

*I. Likelihood of Success on the Merits*

The Eighth Circuit has held that a likelihood of success on the merits is very important to

justify the entry of a preliminary injunction.[120]  And Triosim bears the burden of showing it is

likely to succeed.[121]

Here, Triosim is likely to succeed on the merits of multiple claims.  Because one is enough,

however, the Court will confine its discussion to Triosim's breach of contract claims.  Triosim is

more likely than not to prove that Mr. Drake breached the Trade Secrets provision and the Non-

Compete Provisions of the Non-Compete Agreement between Mr. Drake and Triosim.

With respect the Trade Secrets provision, the Court finds that the process and method to

refurbish/rebuild drums is a Trade Secret under Paragraph 2 of the Non-Compete Agreement, the

---

[117] *See, e.g., Mgmt. Registry, Inc. v. A.W. Companies, Inc.*, 920 F.3d 1181, 1183 (8th Cir. 2019).

[118] *See, e.g., Modern Controls, Inc. v. Andreadakis*, 578 F.2d 1264 (8th Cir. 1978).

[119] *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 112 (8th Cir. 1981).

[120] *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013).  It is worth noting that "where the movant has raised a substantial question and the equities are otherwise strongly in his favor, the showing of success on the merits can be less." *Dataphase*, 640 F.2d at 113.

[121] *Mgmt. Registry*, 920 F.3d at 1183.

Arkansas Trade Secrets Act, and Arkansas caselaw.[122]   The Court also finds that Mr. Drake violated his duties regarding Trade Secrets in three ways.   *First*, the Court has found above that Mr. Drake likely disclosed to West Coast, without authorization, Triosim's method and process for rebuilding/refurbishing washer drums.   Mr. Drake does not dispute that the method and process for rebuilding/refurbishing washer drums is a Trade Secret.   Disclosure of a trade secret obviously violates Paragraph 2 of the Non-Compete Agreement.

     *Second*, the Court has found above that Mr. Drake has provided and continues to provide technical assistance and/or advice to West Coast regarding this method and process.   This violates the Trade Secrets provision of the Non-Compete Agreement, which prevents Mr. Drake from "directly or indirectly, either individually or . . . in any other capacity, us[ing] or disclos[ing], or caus[ing] or allow[ing] to be used or disclosed, any Trade Secrets . . . ."[123]   At the very least, Mr. Drake's past technical assistance caused or allowed West Coast to use Triosim's method and process.   And Mr. Drake's continued assistant currently causes or allows West Coast to use the Trade Secret.

     *Third*, the Court has found above that Mr. Drake has in the past and continues to help West Coast get new customers for their drum refurbishment/rebuild business.   In the context of a situation where Mr. Drake gave Triosim's Trade Secrets to West Coast and knows (or has reason to know) that West Coast will use them to service new customers, Mr. Drake's assistance in obtaining such customers causes or allows West Coast to use the Trade Secrets.   That violates the Trade Secrets provisions.   Mr. Drake objects to this broad reading of the Trade Secrets provision, arguing that the non-competition provisions of the Non-Compete Agreement (and not the Trade

---

[122] *See supra* ¶ 23 and ¶ 24.

[123] Pl.'s Compl. (Doc. 1) at 62-63.

Secrets provision) would speak to a situation where Mr. Drake is recruiting customers for a company that is in competition with Triosim.[124]  But the Non-Compete provisions are addressing normal market competition untainted by a Trade Secrets disclosure.  Those provisions regulate what a person like Mr. Drake may do with any normal competitor—not a competitor to which he has disclosed Triosim's trade secrets.  Just because there is some overlap here—overlap caused by the fact that Mr. Drake disclosed trade secrets to a competitor—is not a reason to read the Trade Secrets provision artificially narrowly and somehow controlled or implicitly cabined by non-compete provisions that were not written to address a situation of Trade Secret disclosure.

The only question left about the trade secrets provision of the contact is whether it is valid and legally enforceable.  The answer is yes.  Arkansas acknowledges the reasonableness and importance of protecting trade secrets.  Indeed, the Arkansas Trade Secrets Act protects trade secrets for as long as they remain secret, and even beyond that if necessary to "eliminate commercial advantage that otherwise would be derived from [a] misappropriation."[125]  Triosim paid a whole lot of money for Southern's Trade Secrets.  The benefit of that bargain only exists if Triosim can protect its Trade Secrets, which gave it a considerable competitive advantage in the market.  That is a valid interest that justifies the Trade Secrets provision in the contact.

With respect to the non-compete provisions, the Court has found above several breaches of the Non-Compete Agreement.  The only real question here is whether the scope and time limit of the Non-Compete is valid and legally enforceable.  In order for a non-compete agreement to be valid in Arkansas, three requirements must be met: (1) the covenantee must have a valid interest

---

[124] Tr. of Mot. Hr'g for TRO and Prelim. Inj. (Doc. 23) at 35-36.

[125] Ark. Code Ann. § 4-75-604(b) ("Upon application to the court, an injunction shall be terminated when the trade secret has ceased to exist; however, the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.").

to protect; (2) the geographical restriction must not be overly broad; and (3) a reasonable time limit must be imposed.[126]   Arkansas "view[s] covenants not to compete differently based on whether they grow out of an employment relationship or whether they are made in connection with the sale of a business. Covenants not to compete in employment contracts are subject to stricter scrutiny than those connected with a sale of a business."[127]   Here, the Court thinks that the covenants not to compete are better thought of as flowing from the sale of a business as opposed to Mr. Drake's employment that was incidental to the sale.   However, even if the stricter employment standard applies, the provisions are still valid and enforceable.

Triosim had and has a valid interest to protect in regard to the non-compete provisions in the Non-Compete Agreement restricting Mr. Drake's contact with customers.[128]   The Arkansas Court of Appeals has recognized that:

> the single most important asset of most businesses is their stock of customers and that protection of that asset is a legitimate interest. We also noted that an employer is especially vulnerable to losing customers when his employee deals with customers away from the business and builds up personal relationships that bind the customers to him.[129]

As a former owner of Southern, Mr. Drake had "buil[t] up personal relationships that bind the customers to him" and "deal[t] with customers away from the business."[130]   Indeed, the evidence

---

[126] *Advanced Envtl. Recycling Tech., Inc. v. Advanced Control Solutions, Inc.*, 372 Ark. 286, 275 S.W.3d 162 (2008).

[127] *Freeman v. Brown Hiller, Inc.*, 102 Ark. App. 76, 81, 281 S.W.3d 749, 754 (2008) (citing *HRR Ark., Inc. v. River City Contractors, Inc.*, 350 Ark. 420, 87 S.W.3d 232 (2002)).

[128]  Pl.'s Compl. (Doc. 1) at 63-65 (Paragraphs titled "Customer Restrictions," "Contractual Relations," "Noncompetition and Non-solicitation," and "Confidentiality").

[129] *Freeman*, 102 Ark. App. at 82, 281 S.W.3d at 755.

[130] *See* Attach. (Second Suppl. Decl. of James Hickman) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18-1) at 3 (stating that Defendant "has some very good contacts at this mill, [and] has clearly remained in touch with them after leaving the company").

suggests that Mr. Drake has a pretty unique and highly sought after reputation and expertise in the industry.[131]   Accordingly, Triosim had a serious interest to protect with the non-compete clauses.

Turning to the second factor regarding the validity of the Non-Compete Agreement, Mr. Drake argues that "this agreement is invalid because the geographical restriction is unreasonable."[132]   "In determining whether the geographic area is reasonable, the trade area of the former employer is viewed."[133]   The Arkansas Supreme Court has recognized that "where a company is actually engaged in nation-wide activities, nation-wide protection would appear to be reasonable and proper."[134]   In this case, Triosim is actually engaged in activities throughout the United States and Canada.   The record at this stage demonstrates that Triosim's territory reached from Vancouver Island all the way to the Georgia coast.   Although the geographic area is large, the market for Kraft papermill maintenance is small,[135] and it is reasonable and proper for Triosim to seek protection against the loss of the limited number of customers its serves.   The Court holds that the geographical restriction is not overly broad.

Finally, regarding the third validity factor, Mr. Drake does not argue that the duration of the Non-Compete Agreement is unreasonable.[136]   Even if he had, the Arkansas Supreme Court has held that there is "nothing inherently unreasonable about a five-year duration restriction," and has "upheld covenants not to compete lasting five years, ten years, twenty years, and without time

---

[131] *See* Pl.'s Compl. (Doc. 1) at 54.

[132] Def.'s Resp. to Mot. for TRO and Prelim. Inj. (Doc. 17) at 11.

[133] *Mercy Health Sys. of Nw. Arkansas, Inc. v. Bicak*, 2011 Ark. App. 341, 9, 383 S.W.3d 869, 874 (2011).

[134] *Bendinger v. Marshalltown Trowell Co.*, 338 Ark. 410, 418, 994 S.W.2d 468, 472 (1999).

[135] *See* Attach. (Second Suppl. Decl. of James Hickman) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18-1) at 1 (stating that there are only 211 kraft papermills in North America); Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18) at 8.

[136] *See* Def.'s Resp. to Mot. for TRO and Prelim. Inj. (Doc. 17) at 10-11.

limit."[137]   The Court holds that the five-year restriction on customer interaction and Confidential Information is reasonable.   Triosim paid millions of dollars in consideration of, among other things, that five-year restriction.   Triosim also employed Mr. Drake for over half of those five years at an annual salary of $180,000,[138] and presumably would likely have employed him for longer had he not breached the Non-Compete Agreement.   Mr. Drake was not hurting for income as a result of the five-year restriction.   Moreover, as noted previously, the evidence suggests that Mr. Drake has a pretty unique and highly sought-after reputation and expertise in the industry. It stands to reason that his personal customer goodwill—and thus the threat from him working for a competitor—would last longer than it would in an average non-compete situation with an average employee or past owner of a sold business.

## II. Threat of Irreparable Harm

The Supreme Court has made crystal clear that, for a preliminary injunction to issue, a movant must "demonstrate that irreparable [harm] is likely in the absence of an injunction."[139] "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages."[140]   Mr. Drake argues that Triosim's alleged injury is not irreparable because the damage to Triosim's business can be calculated.   Mr. Drake notes that Triosim provides an estimate of past damages attributable to Mr. Drake's alleged improper conduct.   So why can't any future damages be calculated in a similar fashion?   Indeed,

---

[137] *Dawson v. Temps Plus, Inc.*, 337 Ark. 247, 255, 987 S.W.2d 722, 727 (1999).

[138] Pl.'s Compl. (Doc. 1) at 57.

[139] *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 992 (8th Cir. 2011); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction.").

[140] *Grasso Ents., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) (quoting *Gen Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009)).

the Eighth Circuit has acknowledged that "economic loss, on its own, is not an irreparable injury so long as the losses can be recovered."[141]

By the barest of threads, the Court concludes there is a concrete risk of irreparable harm in absence of the preliminary injunction. We are not just talking about routine economic loss. Triosim could go out of the business during the pendency of the trial. Or it could lose so much market share—as a result of Mr. Drake's alleged and continuing misconduct—as to make the final outcome of this case all but irrelevant. The U.S. Supreme Court has held that where a party alleges that "absent preliminary relief they would suffer a substantial loss of business and perhaps even bankruptcy," a preliminary injunction is usually warranted.[142] Importantly, the Court specifically acknowledged that "[c]ertainly the latter type of injury sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless."[143] The Complaint, which was verified by the President of Triosim Corporation and was explicitly incorporated into his declaration,[144] says that "[a]bsent the requested injunctive relief, . . . the potential economic loss that has and will continue to result from Defendant's continued violation of the Non-Compete . . . is so great as to threaten the existence of Plaintiffs business."[145] Triosim's President also said that the future loss would be in the millions of dollars.[146]

It would have been nice if Triosim had provided more meat on the bone here. For example, while Triosim has provided the Court with an estimate of its loss of business so far, the Court

---

[141] *Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 915 (8th Cir. 2015) (quoting *DISH Network Serv. L.L.C. v. Laducer*, 725 F.3d 877, 882 (8th Cir. 2013)).

[142] *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975).

[143] *Id.*

[144] Pl.'s Compl. (Doc. 1) at 14; Attach. (Suppl. Decl. of James Hickman) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 5-1) at 1.

[145] Pl.'s Compl. (Doc. 1) at 12. *See also* Pl.'s Mot. for TRO and Prelim. Inj. (Doc. 5) at 3; Pl.'s Memo. in Supp. of Mot. for TRO and Prelim. Inj. (Doc. 6) at 3.

[146] Attach. (Second Suppl. Decl. of James Hickman) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18-1) at 3.

knows nothing about how large or small Triosim's annual revenue is, or even how large or small the annual revenue of Triosim's Southern is.  Nonetheless, in the context of this case, Triosim's factual assertion that it faces an existential threat is enough.  There is a "very small market for washer drum refurbishing and related maintenance,"[147] as there are only 211 pulp and integrated papermills using this process in North America.[148]  Triosim states that it has already lost three papermill customers due to Mr. Drake's conduct, and that it is in immediate danger of losing one of its "very important customers" in the very near future.[149]  The Court concludes that there is a likelihood that Triosim will face substantial, fatal, or market shifting business losses that cannot be entirely repaired by compensatory damages.

There are two additional wrinkles that merit discussion, but ultimately do not change the outcome.  *First*, the Court does not have West Coast before it.  Accordingly, even if the Court enters all the preliminary injunctive relief that Triosim wants, West Coast is not enjoined from competing with Triosim using the Trade Secrets that Mr. Drake disclosed to West Coast.  This raises a serious concern.  Because preliminary injunctive is an extraordinary and drastic step, it is only warranted if it can remedy the precise risk of irreparable harm to the movant.  In this case, there is the very real possibility that the risk of substantial, and maybe fatal, economic harm to Triosim would persist despite the entry of a preliminary injunction against Mr. Drake.

Ultimately, the Court is not persuaded by this admittedly strong argument.  It is a reasonable inference from the record evidence that West Coast would not be able to perform the required business functions or compete as successfully without the continued improper assistance of Mr. Drake.  The President of Triosim has testified that "West Coast had never before performed"

---

[147] Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18) at 8.

[148] Attach. (Second Suppl. Decl. of James Hickman) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18-1) at 1.

[149] *Id.* at 3.

Case 4:20-cv-00395-LPR   Document 26   Filed 05/29/20   Page 32 of 39

drum refurbishing until 2016,[150] and that "[i]t is not conceivable that a group of mechanics with 2-3 years of experience will be able to effectively handle the complex repair requirements."[151]  If Mr. Drake was not lending his know-how and creditability to West Coast, the substantial and perhaps fatal threat to Triosim during the life of this litigation would at least be mitigated.

*Second,* the Non-Compete provisions of the Non-Compete Agreement terminate on June 30, 2020.  Though Triosim requests injunctive relief "notwithstanding any time limits" in the Non-Compete Agreement,[152] it is the Court's view that it can only enjoin Mr. Drake from violating these provisions while they are in existence and effect.  Put another way, Triosim is only entitled to enforcement of the Non-Compete provisions until June 30, 2020.  If there was no Trade Secrets provision, the Court is not sure that any injunctive relief could be provided past June 30, 2020.  However, as discussed above in the Likelihood of Success section, the Court reads the Trade Secrets provision broadly and concludes that much of Mr. Drake's conduct that Triosim says will cause it irreparable harm in the future violates the Trade Secrets provision irrespective of whether it also violates the Non-Compete provisions.  With respect to West Coast, therefore, the Court concludes that it can enjoin the activity that threatens Triosim.

### III. Balance of the Harms

The third *Dataphase* factor is whether the "balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined."[153]

---

[150] Attach. (Suppl. Decl. of James Hickman) to Pl.'s Mot. for TRO and Prelim. Inj. (Doc. 5-1) at 1.

[151] Attach. (Second Suppl. Decl. of James Hickman) to Pl.'s Reply to Mot. for TRO and Prelim. Inj. (Doc. 18-1) at 2.

[152] Pl.'s Mot. for TRO and Prelim. Inj. (Doc. 5) at 4.

[153] *Dataphase*, 640 F.2d at 113.

To determine the harms that must be weighed, courts in the Eighth Circuit look at the threat to each of the parties' rights that would result from granting or denying the injunction.[154]

As stated above, the Court has found that Triosim could suffer irreparable harm in the absence of the requested injunction.  On the other hand, Mr. Drake states that he has "no plans to visit Rayonier or any other client of []Triosim Corporation, either now or in the foreseeable future,"[155] and "that at no time [has he] ever been or acted as an employee or an owner of [West Coast]."[156]  Since Mr. Drake disavows any active relationship with West, and also claims to have "no plans" to contact Triosim's clients "either now or in the foreseeable future," it is not clear how Mr. Drake would suffer any concrete harm if he were enjoined from relevant contact with West Coast and its customers and prospective customers until the merits of this case are determined at trial.

At the hearing on the preliminary injunction, the Court inquired about this precise point with Mr. Drake's counsel.  Counsel's answer was less than clear.  When asked what burden would fall on Mr. Drake if the Court enjoined him from doing something that he claims to have no interest in doing, his counsel responded as follows:

> [H]e's not [working with West Coast] now. He hasn't been doing it since he left the employ of the plaintiff.  He is aware that he's not supposed to do it for another six weeks.  Now, he's 71 years old and he started this great company and sold it.  I don't think he has any interest in doing anything more in the paper business.  But he could wake up tomorrow and change his mind and say, you know, on July 1st I now believe I have the right to refer a client to somebody if I want to.[157]

The Court acknowledges an abstract harm in preventing Mr. Drake from waking up one day during the pendency of this litigation and deciding he wants to work for West.  Any intrusion

---

[154] *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994).

[155] Attach. (Supp. Aff. of A. Dale Drake) to Def.'s Sur-Reply to Mot. for TRO and Prelim. Inj. (Doc. 20-1) at 1.

[156] Ex. A (Aff. of A. Dale Drake) to Def.'s Resp. to Mot. for TRO and Prelim. Inj. (Doc. 17-1) at 4.

[157] Tr. of Mot. Hr'g for TRO and Prelim. Inj. (Doc. 23) at 51-52.

on the freedom of contract is, of course, a harm that must be balanced in this analysis. But that real world harm is minimal given Mr. Drake's professed non-interest in working with West Coast. As discussed below, even with the injunction entered, Mr. Drake may compete against Triosim in any way (and with any company, including West Coast) so long as such competition does not involve (1) disclosure of Triosim's Trade Secrets, (2) work on any aspect of a process or method created with the use of Triosim's Trade Secrets, or (3) assisting companies in obtaining customers for a service that uses Triosim's Trade Secrets.

*IV. Public Interest*

The Eighth Circuit has held that where "noncompete agreements are valid, the public interest calls for their enforcement."[158] The protection of trade secrets is also in the public interest.[159]

## CONCLUSION AND TERMS OF THE PRELIMINARY INJUNCTION

In light of the foregoing, Triosim's request for a preliminary injunction is granted in part. Until the final resolution of this matter, or until the Court orders otherwise, whichever comes first, Mr. Drake is preliminary enjoined as follows:

1.  Between today and June 30, 2020, Mr. Drake may not:

    a.  directly or indirectly, either individually or as an agent, employee, partner, member, stockholder or seller, or in any other capacity solicit any Customer[160]

---

[158] *N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 (8th Cir. 1984).

[159] *See* Ark. Trade Secrets Act, Ark. Code Ann. § 4-75-601 *et seq.*

[160] The term "Customer" in the context of this paragraph only (enforcing Paragraph 3 titled "Customer Restriction" in the Non-Compete Agreement) shall mean (i) any party to whom Triosim's predecessor Southern was providing any products or services on June 30, 2015, or (ii) any party to whom Triosim provided any products or services at any time during the two (2) year period immediately preceding June 30, 2015. *See* Pl.'s Compl. (Doc. 1) at 63.

or Prospect[161] of Triosim for the purpose of providing or seeking to provide to such Customer or Prospect any products or services of a character which is provided by Triosim; provide or seek to provide to any Customer or Prospect of Triosim any trade or business which is competitive with the business of Triosim; or render any assistance to a competitor of Triosim in soliciting any such Customer or Prospect for providing any trade, business, product and/or service which is competitive with the business of Triosim.

b. directly or indirectly cause, or seek to cause, any customer[162] or supplier of Triosim to terminate or otherwise discontinue, or to reduce the volume of the customer's or supplier's business with Triosim or render any assistance to a competitor of Triosim for such purpose.

c. directly or indirectly, engage or invest in, own, manage, operate, finance, control or participate in the ownership, management, operation, financing or control of, be employed by, associated with or in any manner connected with, or render services or advice or other aid to, or guarantee any obligation of, any person who or which is engaged in or is planning to become engaged in, anywhere in the United States or Canada, any business whose products or

---

[161] A "Prospect" in the context of this paragraph only (enforcing Paragraph 3 titled "Customer Restriction" in the Non-Compete Agreement) shall mean (i) any party for whom Triosim's predecessor Southern provided a proposal for products or services at any time during the two (2) year period immediately preceding June 30, 2015; or (ii) any party which the Seller or any Owner has, during the two (2) year period immediately preceding June 30, 2015, specifically identified as a prospective customer and has directed targeted marketing efforts, including letters and in-person visits. *See* Pl.'s Compl. (Doc. 1) at 63.

[162] The term "customer" in the context of this paragraph only (enforcing Paragraph 4 titled "Contractual Relations" in the Non-Compete Agreement) shall mean (i) any party to whom Triosim's predecessor Southern was providing any products or services on June 30, 2015; or (ii) any party to whom Triosim's predecessor Southern provided any products or services at any time during the two (2) year period immediately preceding June 30, 2015. *See* Pl.'s Compl. (Doc. 1) at 64.

services compete, in whole or in part, directly or indirectly, with Triosim's products or services at any time.[163]

d.   directly or indirectly, solicit the business of any customer[164] of Triosim with respect to products or services which compete in whole or in part or directly or indirectly with any products or services of Triosim.

e.   disparage Triosim, the assets Triosim purchased from Southern, the business formerly conducted by Southern, the business conducted by Triosim, or any owner, officer, employee, or agent of Triosim.

f.   directly or indirectly, either individually or as an agent, employee, partner, member, shareholder, or in any other capacity, use, disclose, copy or reproduce or cause to be used, disclosed, copied or reproduced any Confidential Information[165] acquired by Mr. Drake or Triosim's predecessor Southern at any time, and regardless of the fact that Mr. Drake may have participated in the discovery or development of such Confidential Information.

---

[163] The prohibition on financing has one narrow exception: Mr. Drake is not enjoined from collecting payments on the loan he already made to West Coast.

[164] "Customer" in the context of this paragraph only (enforcing Paragraph 5 titled "Noncompetition and Non-solicitation" in the Non-Compete Agreement) shall have the ordinary meaning of "customer," as Paragraph 5 of the Non-Compete Agreement does not specifically define "customer."

[165] "Confidential Information" in the context of this paragraph only (enforcing Paragraph 6 titled "Confidentiality" in the Non-Compete Agreement) shall include, but not be limited to, the following: (1) Triosim's predecessor Southern's customer records, names of vendors, profit and performance reports, prices, selling and pricing procedures and techniques, and financing methods; (2) Southern's customer lists and information pertaining to identities of Southern's customers, their special demands, and their past, current and anticipated requirements for Southern's products or services; (3) specifications, procedures, processes, techniques, manuals and all other information pertaining to products or services of Southern or of others for which Southern has assumed an obligation of confidentiality; (4) Southern's plans, accounting records, financial statements and information, and projections, and (5) personal and employment record of employees (5) information relating to business methods, business practices, business concepts, information, data, reports, recordings and videos, compilations, research, know-how, technology, analyses, notes, interpretations, forecasts, records, documents, agreements, methods, inventions or ideas. *See* Pl.'s Compl. (Doc. 1) at 65.

2. Until such time as Triosim's process and method for refurbishing/rebuilding washer drums loses its status as a Trade Secret, Mr. Drake may not directly or indirectly, either individually or as an agent, employee, partner, member, shareholder or seller, or in any other capacity, use or disclose, or cause or allow to be used or disclosed, any Trade Secrets of Triosim.

    a. The definition of Trade Secret for purposes of this preliminary injunction shall mean information (including a formula, pattern, compilation, program, device, method, technique or process) which: (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.

    b. The Triosim process and method for refurbishment/rebuilding of washer drums, including all constituent parts of the process and method, are considered a Trade Secret for purposes of this preliminary injunction.  The Triosim process and method includes but is not limited to (i) design specifications, fiberglass formulas, piping designs, materials specifications, and flow/draining calculations, (ii) the, collection, correction or use of design, condition, and tolerances to enhance a washer drum's operations, and (iii) washer drum inspections, design, construction, and repairs.

    c. Assisting West Coast (or any other entity) in any way with using, understanding, learning, applying, marketing, or relying on all or part of the

Triosim process and method for refurbishing/rebuilding washer drums will constitute a violation of this portion the preliminary injunction.

d.  Soliciting customers for West Coast, or assisting West Coast with obtaining customers, will constitute a violation of this portion the preliminary injunction if Mr. Drake knows or has reason to know that West Coast will service those customers using all or part of the Triosim process and method for refurbishing/rebuilding washer drums.  The same goes for any other entity.

e.  Mr. Drake may not unilaterally decide if all or part of the aforementioned process and method has lost its status as a Trade Secret.  If Mr. Drake believes that has occurred, or if he believes that a part of the process discussed above was never a Trade Secret to begin with, Mr. Drake must come back to the Court and ask the Court to lift or revise its preliminary injunction for that specific reason.

Federal Rule of Civil Procedure 65(c) states that a court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  The Court considers $360,000 to be the proper amount.  This case is likely to last two years.  While the Court cannot accurately pinpoint what the economic damage to Mr. Drake might be from the foregoing preliminary injunction, a fair estimate seems to be what would have been his annual salary at Triosim for two years.  His annual salary in some sense appears to be pegged to the estimated value of allowing him to compete with Triosim.  This probably somewhat undervalues the potential harm to Mr. Drake from the preliminary injunction, but it is the best and fairest estimate the Court knows how to make.  Triosim is ordered to post a

$360,000 bond within fourteen (14) days of this Order to provide security against any financial harm Mr. Drake may sustain if this lawsuit is resolved in his favor.

      IT IS SO ORDERED this 29th day of May 2020.

LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE